NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO E.D., R.D., and
F.D.

No. 1 CA-JV 24-0025

FILED 09-03-2024

---

Appeal from the Superior Court in Mohave County
No. B8015JD202004046
The Honorable Rick A. Williams, Judge

**AFFIRMED**

---

COUNSEL

Harris & Winger PC, Flagstaff
By Chad Joshua Winger
*Counsel for Appellant Michelle G.*

The Law Offices of Robert Casey, Phoenix
By Robert Ian Casey
*Counsel for Appellant Benjamin D.*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee*

Mohave County Legal Advocate, Kingman
By Bobbie Shin
*Counsel for Appellee Children*

---

**MEMORANDUM DECISION**

Vice Chief Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Michael S. Catlett and Judge Jennifer M. Perkins joined.

---

**H O W E**, Judge:

¶1          Michelle G. ("Mother") and Benjamin D. ("Father") appeal from the order terminating their parental rights. Because reasonable evidence supports the juvenile court's best-interests finding, we affirm the termination order.

## FACTS AND PROCEDURAL HISTORY

¶2          Mother and Father are the parents of four children, D.D. (born 2006), E.D. (born 2009), R.D. (born 2013), and F.D. (born 2015). This appeal involves only the three minor children.

¶3          In August 2020, the Department of Child Safety ("DCS") received a report alleging that adults in the family's home were sexually abusing the children. When DCS employees arrived at the home, they found that the police were already there because of a verbal argument between Father and the children's step-grandfather. After speaking to the children about the alleged sexual abuse and observing the home's filthy state, DCS employees took emergency temporary custody of the children. DCS subsequently placed the children in foster homes and petitioned for a dependency.

¶4          A month after the children's removal, the juvenile court adjudicated them dependent as to both parents and ordered a family-reunification case plan. The court also directed DCS to provide the parents with reunification services. As the dependency case moved forward, DCS offered the parents individual counseling, parent aide services, parenting classes, psychological evaluations, transportation, supervised visitation, and referrals to community resources. As part of the parents' case plan, DCS also stressed to them that they needed to find appropriate housing for the children.

¶5          The parents engaged in these services and developed a better understanding of their children's needs and how to protect them. The parents also consistently attended supervised visits, which usually went well. From October 2022 to July 2023, the parents progressed to unsupervised visits. In July 2023, however, DCS reinstated supervision following Father's arrest during a visit and Mother's arrest while traveling to a visit. Although the parents had worked on their case plans for three years, they still had no safe home for the children.

¶6          In July 2023, DCS submitted a progress report recommending that the court change the case plan to severance and adoption "if a suitable residence cannot be verified by the hearing date." At the next review hearing, the parents failed to appear because they were in jail. In light of the parents' circumstances, DCS moved to change the case plan to severance and adoption, which the court granted.

¶7          In January 2024, the juvenile court held a one-day termination trial. The DCS case manager testified that the parents stayed in contact with DCS and were mostly engaged in DCS services. She further testified that although the parents had benefited from some of these services and increased their ability to care for their children, they still struggled to put the children's needs before their own. When asked what was preventing the parents from reunifying with the children, the case manager answered that it was "safe and stable housing." She went on to state that "[t]he parents don't have a home for them to live in. We don't know that the parents would be able to provide the children's basic need[s]."

¶8          The case manager also testified that E.D. has autism and R.D. potentially has dyslexia, creating special needs. She testified that the children's foster placements were able to meet the children's special needs. She also testified that the children were adoptable and that their foster parents were appropriate adoptive placements. She opined that terminating the parent-child relationship was in the children's best interests because it would "open the children up for permanency" and would prevent them from lingering in foster care. She acknowledged, however, that "[n]one of [the children] want to be adopted" and that the children want to return home.

¶9          Mother next testified that she was on the wait list for an apartment and asked for more time to secure an apartment for the children. Father then testified that he had applied for an apartment and found a job as a cook. He expressed concern about the children's religious upbringing in their foster homes.

¶10       At the end of trial, the court ruled from the bench that DCS had proved the statutory grounds for termination as to both parents by clear and convincing evidence. *See* A.R.S. § 8-533(B)(8)(c). The court found that "as of today each parent lacks suitable housing for the children" and that this condition "has lasted for well-over 3 years, almost 3 and-a-half years." The court noted that "the concerns go beyond just the housing; but again, that seems to be the main concern by the Department given today's testimony." The court found that DCS offered the parents "numerous services" and that the parents engaged in some services but were unable to demonstrate behavioral changes that would resolve DCS's safety concerns. The court also found that "each parent continues to struggle with understanding the children's needs and the safety concerns raised by the Department." The court found "a substantial likelihood that the parents will not be capable of exercising proper and effective parental care and control in the near future." The juvenile court told the parties that it would take the issue of best interests under advisement and issue a ruling as soon as possible. The juvenile court memorialized the court's oral findings on statutory grounds in an unsigned minute entry.

¶11       On January 29, 2024, the juvenile court entered a written order terminating parental rights. The court referred to its prior rulings that DCS proved the time-in-care statutory ground for termination, although it did not expressly restate those findings in the written order, which would have been the better practice. *See* A.R.S. § 8-538(A); *Ruben M. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 236, 241 ¶ 25 (App. 2012). Regardless, the court made detailed best-interests findings and concluded that "terminating parental rights will serve the children's best interests by allowing them to continue to live in safe, stable homes where their needs can be met, and they can thrive." The court also concluded that "while the parents engaged in reunification services and made progress in certain areas, there remains a significant risk of abuse or neglect to the children if the motion for termination is denied."

¶12       The parents timely appealed from the termination order. We have jurisdiction. A.R.S. §§ 8-235(A), 12-120.21(A), 12-2101(A); Ariz. R.P. Juv. Ct. 601(a).

## DISCUSSION

¶13       A parent's fundamental right to custody and control of his or her child is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248–49 ¶¶ 11–12 (2000). The juvenile court may terminate the parent-child relationship if DCS proves by clear and convincing evidence at least one of the statutory grounds set forth in A.R.S. § 8-533(B). *Id.* at 249 ¶ 12. The court

4

must also find by a preponderance of the evidence that termination is in the child's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284 ¶ 22 (2005). Because the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts," *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334 ¶ 4 (App. 2004), we will accept its factual findings if supported by reasonable evidence and inferences and will affirm the order terminating parental rights unless it is clearly erroneous, *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478–79 ¶¶ 30–31 (2023). We do not reweigh the evidence. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47 ¶ 8 (App. 2004).

**¶14**         In this case, because the juvenile court terminated parental rights under the time-in-care statutory ground, DCS was required to prove, among other requirements, that it "made a diligent effort to provide [the parents] appropriate reunification services." A.R.S. § 8-533(B)(8)(c). What constitutes a diligent effort will vary, but "at the least" DCS must "identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances *as they arise throughout the time-in-care period*, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 23 ¶ 50 (App. 2019).

## I.      Father Waived His Argument that DCS Failed To Make a Diligent Effort To Provide Appropriate Reunification Services to Father.

**¶15**         Father contends DCS failed to fulfill its diligent-effort obligation because it did not provide him with housing assistance or direct him to services to help him with housing. DCS responds that he waived this argument by not raising it in the juvenile court.

**¶16**         Because the juvenile court is in the best position to evaluate the adequacy of reunification efforts, a parent is precluded from challenging these efforts for the first time on appeal. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179 ¶ 16 (App. 2014) (holding that when "the court finds that [DCS] has made reasonable efforts to provide such services . . . , a parent who does not object in the juvenile court is precluded from challenging that finding on appeal"). Thus, if Father believed that DCS was not making diligent efforts "at any point, it was incumbent on [him] to promptly bring those concerns to the attention of the juvenile court." *Id.* at 179 ¶ 18.

¶17 During this dependency case, the juvenile court held 13 review hearings. At each of those hearings, DCS submitted a progress report to the court describing the services it offered to the parents. The court found that DCS had made reasonable efforts to provide the parents appropriate reunification services. Father never objected to these reasonable-efforts findings in the minute entries.

¶18 Further, during the trial, Father did not argue that DCS's efforts to help him find housing were inadequate. He did not object when the case manager testified that the parents never requested additional services from DCS. For these reasons, he has waived his challenge to the adequacy of the services DCS offered him. *See id.* at 178 ¶ 16 ("[The dependency] process demands that parents voice their concerns about services to the juvenile court in a timely manner.").

## II. Reasonable Evidence Supports the Juvenile Court's Best-Interests Finding.

¶19 Mother and Father both challenge the juvenile court's best-interests finding, arguing that the court's finding was an abuse of discretion and deficient as a matter of law. We review a best-interests finding for an abuse of discretion and reverse only if "no reasonable evidence [] support[s] [the finding]." *Mary Lou C.*, 207 Ariz. at 47 ¶ 8 (citations omitted). When considering the child's best interests, the court must consider the totality of the circumstances, which includes the child's stability and security. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150–51 ¶¶ 12–13 (2018).

¶20 To prove that termination is in the child's best interests, DCS must show either: (1) the child will benefit from the termination; or (2) the child will be harmed if the termination is denied. *Id.* at 150 ¶ 13. The court may find a child would benefit from termination if DCS has an adoption plan or if the child is adoptable. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3–4 ¶ 12 (2016). The court may also find that a child will benefit from the permanency and stability that an adoption would provide. *Oscar O.*, 209 Ariz. at 337 ¶ 16. When a prospective adoptive placement is meeting the child's needs and the child's adoption is both legally possible and likely, the court may find that termination of the parental rights is in the child's best interests. *Demetrius L.*, 239 Ariz. at 4 ¶ 12 (internal citations omitted).

### A. The Juvenile Court's *Benefit* Finding

¶21 Mother argues that, as a matter of law, the juvenile court's best-interests finding fails because the court could not make a requisite

"benefit" finding that "the children will obtain a permanent, stable, and secure home through a future adoption." She asserts the children's "opposition to termination renders adoption problematic and possibly a legal impossibility for any of the Children over the age of 12." *See* A.R.S. § 8-106(A)(3); *see also Titus S. v. Dep't Child Safety*, 244 Ariz. 365, 371, 373 ¶¶ 24, 30 (App. 2018) (reversing the termination order because the children, who were over the age of 12, "consistently stated their intent to withhold" their consent to any adoption, and the court made no other benefit or detriment finding).

**¶22**        Contrary to Mother's assertion, the evidence presented at trial supports the juvenile court's finding that the children will benefit from the termination. The case manager testified that the children are adoptable, their foster parents are adoptive placements, and the foster parents are meeting the children's special needs. In addition, the record contains several progress reports DCS submitted describing the children's special needs and detailing how the foster parents were successfully meeting those needs. From this evidence, the court could reasonably infer that the proposed adoptions were legally possible and likely to occur if the parent-child relationship were terminated. *See Demetrius L.*, 239 Ariz. at 3 ¶ 9 ("Because the juvenile court is in the best position to weigh evidence and assess witness credibility, we accept the juvenile court's findings of fact if reasonable evidence and inferences support them[.]"). Therefore, the juvenile court's finding that the children will benefit from termination because "all three children are adoptable" and in "a potential adoptive placement" is supported by evidence from trial and is not legal error.

### B.        The Juvenile Court's *Detriment* Finding

**¶23**        The parents also challenge the juvenile court's findings that the children would be harmed if termination were denied. First, Father points to A.R.S. § 8-538(A), which requires that "[e]very order of the court terminating the parent-child relationship . . . be in writing and . . . recite the findings on which the order is based[.]" He argues the juvenile court's detriment findings are deficient under this statute because the court focused on allegations of neglect and abuse from years before DCS removed his children and contain no findings about his current circumstances.

**¶24**        The purpose of requiring written findings is to enable this court to determine exactly which issues the juvenile court decided and whether the court correctly applied the law. *Ruben M.*, 230 Ariz. at 240 ¶ 24. Thus, the juvenile court need not detail each fact that supports its ruling, *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 451–52 ¶ 19 (App. 2007),

but must include all "ultimate facts" relied upon in reaching its decision, *Ruben M.*, 230 Ariz. at 241 ¶ 25.

**¶25**        In the termination order, the juvenile court made several record-supported findings explaining the court's best-interests determination. The court found, for instance, that (1) "neither parent has been able to provide an appropriate, stable, and safe residence for their children" for more than ten years; (2) the children have special needs, and "the parents have not demonstrated an understanding of those needs or an ability to adequately address them going forward"; and (3) despite the case lasting three-and-a-half years, "[t]he parents have been unable to demonstrate safety or stability." These findings are sufficient under A.R.S. § 8-538(A) to explain how the court reached its conclusion that the children would be harmed if the termination motion were denied.

**¶26**        Second, Mother argues that these same detriment findings fail to properly consider the children's wish to retain a parent-child relationship with her. In the best-interests stage of the analysis, "[t]he weight of the presumption that the child shares the parent's interest in preserving the family relationship is greatly reduced by the potential harm to the child from maintaining a relationship with an unfit parent." *Kent K.*, 210 Ariz. at 285 ¶ 31. In determining best interests, the court's "foremost concern" is "the child's interest in stability and security." *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 583 ¶ 27 (2021) (cleaned up).

**¶27**        The termination order shows that the juvenile court carefully considered the totality of the circumstances, including evidence of the children's bond and desire to reunify with their parents. The court expressly recognized that "[t]he children love and support their parents and want their parents to have more time to reunify." Although the children's bonded relationship was a factor for the juvenile court to consider, it is not dispositive in addressing best interests. *See Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 99 ¶ 12 (App. 2016). As noted, the record supports the court's finding that continuing the relationship with the parents would harm the children. We will not reweigh that evidence. *Mary Lou C.*, 207 Ariz. at 47 ¶ 8.

**¶28**        Third, Mother argues that so long as the children remain dependent, DCS and the juvenile court can continue to protect them from any risk of parental abuse, neglect, or emotional harm by managing the parents' relationship with the children. But Arizona law recognizes that long-term foster care is harmful to children. S*ee Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 476 ¶ 23 (App. 2022) (explaining that "the legislature's

intent to avoid having children linger in foster care echoes throughout other grounds justifying termination in § 8-533(B)," including (B)(8)). Additionally, the "juvenile court may find that continuing the parent-child relationship would be detrimental to the child's well-being because the child would linger in care with no prospect of reunifying with the parent." *Steven M. v. Dep't of Child Safety*, 254 Ariz. 426, 431 ¶ 15 (App. 2023).

**¶29** Here, Mother has not challenged the juvenile court's finding of statutory grounds for termination, including its finding that she is unlikely to be able to provide the children with a safe and stable home in the near future. A.R.S. § 8-533(B)(8)(c) (requiring that the court find "a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future"); *Crystal E. v. Dep't of Child Safety*, 241 Ariz. 576, 577–78 ¶ 5 (App. 2017) (explaining that a party's failure to challenge the time-in-care ground constitutes waiver and abandonment of the claim). Under these circumstances, the juvenile court did not abuse its discretion by finding that the termination will protect the children from "a significant risk of abuse or neglect" and allow "them to continue to live in safe, stable homes where their needs can be met, and they can thrive." These findings support the court's best-interests determination and are supported by evidence in the record.

## CONCLUSION

**¶30** For these reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AGFV

9